# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TERRELL JOVAN PARKER,**

      **Plaintiff,**

      **v.**                            **CASE NO.  25-3106-JWL**

**J. KIDD, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER
## TO SHOW CAUSE

Plaintiff brings this pro se action under 42 U.S.C. § 1983.  The Court granted Plaintiff leave to proceed in forma pauperis.  Plaintiff is detained at the Reno County Jail in Hutchinson, Kansas ("RCJ").

On April 25, 2025, the Court entered a Memorandum and Order (Doc. 8) ("M&O") directing the officials responsible for the operation of the RCJ to prepare a *Martinez* Report.  The *Martinez* Report (Doc. 9) has now been filed.  The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A."  (Doc. 8, at 10.)  The Court will therefore screen the Complaint in light of the Report.  The Court's screening standards are set forth in the M&O.  (Doc. 8, at 2-4.)

### I.  Nature of the Matter Before the Court

Plaintiff's Complaint stems from an incident that occurred on April 30, 2025.  According to the Complaint, an inmate in the cell next to Plaintiff set off the sprinkler system, flooding A Pod of the RCJ.  (Doc. 1-1, at 2.)  Several deputies arrived to clean up the water.  *Id*.  They let the inmate who caused the flooding out of his cell to go upstairs without being cuffed.  *Id*.  Deputy Kidd then came to Plaintiff's cell and told him to cuff up.  *Id*.  Plaintiff questioned why he had to

cuff up, and Kidd got angry. *Id.* He retrieved the taser gun and opened the food pass to Plaintiff's cell. *Id.* Plaintiff had put his sleeping mat in front of the door. *Id.* While trying to explain, Plaintiff leaned toward the food pass and put his arm through. *Id.* Kidd repeatedly slammed Plaintiff's hand and arm with the food pass door. *Id.*; Doc. 1, at 3. He then grabbed Plaintiff's arm to extend it and held the stun gun on his arm, shocking him several times. *Id.* at 1, 3. When Plaintiff asked him to let go, Kidd smiled and said, "Yeah, motherfucking nigger. Yeah." (Doc. 1, at 3; Doc. 1-1, at 3.) Plaintiff eventually pulled his arm free. (Doc. 1-1, at 3.) Kidd left and returned with Deputy Dubby. *Id.* Plaintiff cuffed up, and Kidd put him in cell A1 where there was also standing water on the floor. *Id.* They left Plaintiff cuffed with "extra tight" cuffs for two hours causing bleeding and nerve damage to Plaintiff's wrists. *Id.*; Doc. 1, at 2. Plaintiff states that he feared for his life. (Doc. 1, at 2.) He also claims that he was the only African-American inmate on A pod and the only inmate who was not moved out of the water. *Id.* Photographs were taken of Plaintiff's injuries after the incident, but he alleges that he was denied medical care, such as an x-ray of his injured and swollen arm and treatment for burns from the taser. (Doc. 1, at 4; Doc. 1-1, at 1.)

In response to Plaintiff's grievance about the incident, Sergeant McDaniel said, "When an officer gives you the command to let go of the food pass door, you should follow that command. Had you done that, no force would have been necessary." (Doc. 1-1, at 3.) Plaintiff appealed the grievance, and two other RCJ officials rejected his appeal. Captain Blumanhoerst said, "I have reviewed video of this incident, talked with another inmate in A pod and also other Deputies present. Based on interview and video I cannot see any of what you describe." *Id.*

Plaintiff claims that Kidd used excessive force and racist slurs. He further claims he was subjected to racial discrimination and denied medical care. Plaintiff names as Defendants Deputy

J. Kidd; Sergeant McDaniels; Captain Blumanhoerst; and Shawn (lnu), Undersheriff of Reno County. Plaintiff seeks relief in the form of $2 million.

## II. The *Martinez* Report

The Report disagrees with Plaintiff's account of events in several respects. According to the Report, Corporal Kidd ordered Plaintiff to put his hands through the food pass to cuff up prior to being moved from the flooded housing unit. Plaintiff refused, saying, "I ain't going to do shit." (Doc. 9-1, at 2.) Kidd told him that force would be used if he did not comply. *Id*. Kidd asked another deputy for a taser and continued to warn Plaintiff as the taser charged. *Id.* Instead of complying, Plaintiff put his mattress up to block a direct line to himself. *Id*. Kidd then asked Deputy Marshall to get the FN303 (pepper ball launcher). *Id*. Kidd warned Plaintiff that he would use the FN303 if Plaintiff did not comply. *Id*. Before Kidd used the FN303, a Signal Green (medical emergency) was called in another housing unit. *Id*. Some of the deputies who had been present responded to the Signal Green, leaving Kidd and Corporal Becker to deal with Plaintiff. *Id*.

Kidd decided to leave Plaintiff and return once the Signal Green was resolved. *Id*. When he attempted to close the food pass door, Plaintiff put his right arm through, preventing Kidd from doing so. *Id*. Kidd told Plaintiff several times to remove his arm, and he continued to refuse. *Id*. Due to not knowing the circumstances of the Signal Green, Kidd grabbed Plaintiff's wrist and straightened his arm. *Id*. Plaintiff continued to resist by pushing his arm toward Kidd rather than withdrawing it. *Id*. Kidd warned him that if he did not remove his arm, he would be tased. *Id*. Plaintiff continued to refuse to comply. *Id*. Kidd then administered one 3.035-second drive stun to Plaintiff's forearm. *Id*.; Axon Taser Log Report, Doc. 9-1, at 5. Plaintiff pulled his arm out of the food pass, allowing Kidd and Becker to close the food pass door and respond to the Signal

Green.  *Id*. at 2.  After the Signal Green was resolved, Kidd, Deputy Dube, and Deputy Moreno returned to move Plaintiff.  Plaintiff put his hands outside the food pass to be restrained without incident.  *Id*.

The Report denies that any racist language was used during the incident.  (Doc. 9, at 4.)

The Report states that Plaintiff did not ask to see a doctor until May 5, 2025.  (Doc. 9, at 4.)  A physician's note from that date states Plaintiff complained of left arm pain and said his arm was struck multiple times with the small door.  (Doc. 9-1, at 3.)  He also reported being tased in the arm multiple times.  *Id*.  The physician documented that Plaintiff had full range of motion without discomfort, no bony tenderness, and normal pronation and supination with neurovascular intact.  *Id*.  The doctor noted superficial anterior abrasions and diagnosed a forearm contusion.  *Id*.  Plaintiff was to return to the clinic as needed.  *Id*.  According to the medical records provided with the Report, Plaintiff's next medical visit was two months later for an unrelated complaint.  *Id*. at 4.

The Report does not include any video footage or photographs.  However, Plaintiff refers to photographs being taken of his arm after the incident, and the Report mentions body cam footage of the incident.  (Doc. 9, at 4.)

## III. Discussion

### A. Excessive Force

As explained in the M&O, "[e]xcessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth Amendment, depending on where in the criminal justice system the plaintiff is at the time of the challenged use of force."  *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (citation omitted).  The Fourteenth Amendment governs any claim of excessive force brought by a "pretrial detainee"—one who has had a "judicial determination of

4

probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Est. of Booker v. Gomez*, 745 F.3d 405, 418–19 (10th Cir. 2014) (quoting *Bell v. Wolfish,* 441 U.S. 520, 536 (1979). On the other hand, the Fourth Amendment governs excessive force claims arising from "treatment of [an] arrestee detained *without a warrant*" and "*prior to* any probable cause hearing." *Id.*

Excessive force claims under both the Fourteenth and Fourth Amendments are based on objective reasonableness. The Supreme Court held in *Kingsley v. Hendrickson* that "the appropriate standard for a pretrial detainee's excessive[-]force claim is solely an objective one" and that therefore "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015); *see also Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) ("[T]here is no subjective element of an excessive-force claim brought by a pretrial detainee."). Therefore, to make out a Fourteenth Amendment violation, Plaintiff must show that the defendants' conduct "was objectively harmful enough to establish a constitutional violation." *Brown*, 974 F.3d at 1183.

In assessing reasonableness, a court "looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Vette*, 989 F.3d at 1169 (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)). "The inquiry is an objective one, and one that considers the totality of the circumstances." *Id*. Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Supreme Court in *Graham* listed factors that may be relevant to the reasonableness analysis: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). In evaluating the final factor, a court considers "whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use of force." *Vette*, 989 F.3d at 1169. The Tenth Circuit has also held that "initial resistance does not justify the continuation of force once the resistance ceases." *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (citations omitted).

According to both Plaintiff's allegations and the Report, Plaintiff initially questioned Kidd's order to cuff up rather than obeying. Kidd had a legitimate reason for making the order in that the unit was flooded and Plaintiff needed to be moved. While Plaintiff questions the need to be cuffed, it is not unreasonable that he would be asked to do so. Next, Plaintiff admits that he put his arm through the food pass. He apparently did this at the same time as Kidd was trying to close the food pass door to go respond to a medical emergency. Plaintiff does not explain why he did this, and it is difficult to see a purpose other than continuing to obstruct and resist Kidd's orders.

The accounts diverge at this point, with Plaintiff claiming Kidd slammed the door down on his arm, then grabbed his arm and tased him repeatedly. Kidd's account does not mention slamming the door on Plaintiff's arm but describes warning Plaintiff several times before tasing him once. The single taser deployment is confirmed by a technical report for the taser use. Moreover, the doctor's note indicates that Plaintiff had a contusion with no indication of broken bones, burns, discomfort, or nerve damage.

This Court recently considered another case where an inmate claimed excessive force related to a food pass door.  In that case, the plaintiff alleged that he stuck his arm through the food pass to be uncuffed as ordered, and two corrections officers twisted his wrist severely and pulled the cuff so hard his forearm muscle tore.  *Cheatham v. Howes*, No. 25-3091-JWL, 2025 WL 1784928, at *3 (D. Kan. June 27, 2025).  In that case, the Court found the plaintiff's excessive force claim survived initial screening.  *Id.*

Here, it appears the use of force was rationally related to a legitimate governmental objective of getting Plaintiff to cuff up to be moved to a different cell.  According to the Report, the force used does not appear to have been excessive in relation to that purpose.  *See Brown*, 974 F.3d at 1182.  Plaintiff is given an opportunity, after viewing any video footage and photographs related to the incident, to respond to the Report and show good cause why this claim should not be dismissed for failure to state a claim.

### B.  Defendants

In addition to Kidd, Plaintiff names Sergeant McDaniels, Captain Blumanhoerst, and Shawn (lnu), Undersheriff of Reno County, as defendants.  It appears that these defendants are named on the basis of their response to Plaintiff's grievance about the incident.

Plaintiff's only allegations involving these defendants appear to relate to their denials of his grievance.  The Tenth Circuit has held that "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983."  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Whitington v. Ortiz,* 307 F. App'x 179, 193 (10th Cir. 2009) (unpublished); *Larson v. Meek,* 240 F. App'x 777, 780 (10th Cir. 2007) (unpublished); *see also Lomholt v. Holder,* 287 F.3d 683, 684 (8th Cir.2 002) (per curiam) ("[Plaintiff] failed to state First Amendment claims relating to his

grievances . . . because defendants' denial of his grievances did not state a substantive constitutional claim.")).  Plaintiff has not adequately alleged any factual basis to support an "affirmative link" between these defendants and any alleged constitutional violation.  *See id.*  Plaintiff's claims against McDaniels, Blumanhoerst, and Shawn (lnu) are subject to dismissal.

The Tenth Circuit has held several times that there is no constitutional right to an administrative grievance system.  *Gray v. GEO Group, Inc.*, No. 17–6135, 2018 WL 1181098, at *6 (10th Cir. March 6, 2018) (citations omitted); *Von Hallcy v. Clements*, 519 F. App'x 521, 523–24 (10th Cir. 2013); *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011); *see also Watson v. Evans*, Case No. 13–cv–3035–EFM, 2014 WL 7246800, at *7 (D. Kan. Dec. 17, 2014) (failure to answer grievances does not violate constitutional rights or prove injury necessary to claim denial of access to courts); *Strope v. Pettis*, No. 03–3383–JAR, 2004 WL 2713084, at *7 (D. Kan. Nov. 23, 2004) (alleged failure to investigate grievances does not amount to a constitutional violation); *Baltoski v. Pretorius*, 291 F. Supp. 2d 807, 811 (N.D. Ind. 2003) (finding that "[t]he right to petition the government for redress of grievances . . . does not guarantee a favorable response, or indeed any response, from state officials").  Any claims regarding the grievance process and the failure to properly respond to grievances are subject to dismissal for failure to state a claim.

## C.  Other Claims

Plaintiff alleges that Kidd used racial slurs and that Plaintiff was not moved out of the flooded cells while the white inmates were moved.  These allegations are not sufficient to state an equal protection claim.  "Mere verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.'"  *Alvarez v. Gonzales*, 155 F. App'x 393, 396 (10th Cir. 2005) (unpublished), *quoting Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992)).  Plaintiff has not credibly alleged that the defendants treated

him less favorable solely because of his race.  *See Morman v. Campbell County Memorial Hosp.*, 623 F. App'x 927, 934 (10th Cir. 2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Plaintiff also alleges that he was denied medical care after the incident.  According to the Report, Plaintiff was seen by a doctor five days later.  At that point, Plaintiff had full range of motion without discomfort, no bony tenderness, and normal pronation and supination with neurovascular intact.  The doctor noted only superficial anterior abrasions and diagnosed a forearm contusion.  Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm.  *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993).  In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted).  "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).  Plaintiff has not shown that he suffered substantial harm as a result of the apparent delay in medical examination.

Plaintiff's claims based on discrimination and denial of medical care are subject to dismissal.

**IV.  Conclusion**

In light of the *Martinez* Report and on further review of the Complaint, the Court is considering dismissal of this matter for failure to state a claim on which relief can be granted. Plaintiff will be given an opportunity, after viewing any video footage and photographs related to the incident, to respond to the *Martinez* Report and to show good cause why dismissal should not

be entered.  Failure to respond by the Court's deadline may result in dismissal of this action without further notice.

**IT IS THEREFORE ORDERED BY THE COURT** that the officials responsible for the operation of the Reno County Jail shall provide the Court and Plaintiff with any photographs and recordings related to Plaintiff's claims, or a statement that no such evidence exists, by **September 23, 2025**.

**IT IS FURTHER ORDERED** that Plaintiff is granted until **October 23, 2025,** in which to respond to the *Martinez* Report and to show good cause why this action should not be dismissed for failure to state a claim.

**IT IS SO ORDERED**.

**Dated September 16, 2025, in Kansas City, Kansas.**

**S/   John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**