IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**TERRELL JOVAN PARKER,**

  **Plaintiff,**

  **v.**           **CASE NO. 25-3106-JWL**

**J. KIDD, et al.,**

  **Defendants.**

<u>**MEMORANDUM AND ORDER**</u>

  Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. He is detained at the Reno County Jail in Hutchinson, Kansas ("RCJ"). The Court granted Plaintiff leave to proceed in forma pauperis.

  On April 25, 2025, the Court entered a Memorandum and Order (Doc. 8) ("M&O") finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate RCJ officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered RCJ officials to prepare and file a *Martinez* Report. The *Martinez* Report (Doc. 9) (the "Report") was filed, and the Court entered a show cause order (Doc. 11; "MOSC"). Plaintiff has now filed several responses to the *Martinez* Report and the MOSC. *See* Docs. 16, 18, 19, 20, and 21.

**I. Nature of the Matter before the Court**

  Plaintiff's Complaint stems from an incident that occurred on April 30, 2025. According to the Complaint, an inmate in the cell next to Plaintiff set off the sprinkler system, flooding A Pod of the RCJ. (Doc. 1-1, at 2.) Several deputies arrived to clean up the water. *Id.* They let the inmate who caused the flooding out of his cell to go upstairs without being cuffed. *Id.* Deputy Kidd then came to Plaintiff's cell and told him to cuff up. *Id.* Plaintiff questioned why he had to

1

cuff up, and Kidd got angry. *Id.* He retrieved the taser gun and opened the food pass to Plaintiff's cell. *Id.* Plaintiff had put his sleeping mat in front of the door. *Id.* While trying to explain that he had already mopped up the water in his cell, Plaintiff leaned toward the food pass and put his arm through. *Id.* Kidd repeatedly slammed Plaintiff's hand and arm with the food pass door. *Id.*; Doc. 1, at 3. He then grabbed Plaintiff's arm to extend it and held the stun gun on his arm, shocking him several times. *Id.* at 1, 3. When Plaintiff asked him to let go, Kidd smiled and said, "Yeah, motherfucking nigger. Yeah." (Doc. 1, at 3; Doc. 1-1, at 3.) Plaintiff eventually pulled his arm free. (Doc. 1-1, at 3.) Kidd left and returned with Deputy Dube. *Id.* Plaintiff cuffed up, and Kidd put him in cell A1 where there was also standing water on the floor. *Id.* They left Plaintiff cuffed with "extra tight" cuffs for two hours causing bleeding and nerve damage to Plaintiff's wrists. *Id.*; Doc. 1, at 2. Plaintiff states that he feared for his life. (Doc. 1, at 2.) He also claims that he was the only African-American inmate on A pod and the only inmate who was not moved out of the water. *Id.* Photographs were taken of Plaintiff's injuries after the incident, but he alleges that he was denied medical care, such as an x-ray of his injured and swollen arm and treatment for burns from the taser. (Doc. 1, at 4; Doc. 1-1, at 1.)

In response to Plaintiff's grievance about the incident, Sergeant McDaniel said, "When an officer gives you the command to let go of the food pass door, you should follow that command. Had you done that, no force would have been necessary." (Doc. 1-1, at 3.) Plaintiff appealed the grievance, and two other RCJ officials rejected his appeal. Captain Blumanhoerst said, "I have reviewed video of this incident, talked with another inmate in A pod and also other Deputies present. Based on interview and video I cannot see any of what you describe." *Id.*

Plaintiff claims that Kidd used excessive force and racist slurs. He further claims he was subjected to racial discrimination and denied medical care. Plaintiff names as Defendants Deputy

J. Kidd; Sergeant McDaniels; Captain Blumanhoerst; and Shawn (lnu), Undersheriff of Reno County. Plaintiff seeks relief in the form of $2 million.

## II. The *Martinez* Report

The Report disagrees with Plaintiff's account of events in several respects. According to the Report, Corporal Kidd ordered Plaintiff to put his hands through the food pass to cuff up prior to being moved from the flooded housing unit. Plaintiff refused, saying, "I ain't going to do shit." (Doc. 9-1, at 2.) Kidd told him that force would be used if he did not comply. *Id.* Kidd asked another deputy for a taser and continued to warn Plaintiff as the taser charged. *Id.* Instead of complying, Plaintiff put his mattress up to block a direct line to himself. *Id.* Kidd then asked Deputy Marshall to get the FN303 (pepper ball launcher). *Id.* Kidd warned Plaintiff that he would use the FN303 if Plaintiff did not comply. *Id.* Before Kidd used the FN303, a Signal Green (medical emergency) was called in another housing unit. *Id.* Some of the deputies who had been present responded to the Signal Green, leaving Kidd and Corporal Becker to deal with Plaintiff. *Id.*

Kidd decided to leave Plaintiff and return once the Signal Green was resolved. *Id.* When he attempted to close the food pass door, Plaintiff put his right arm through, preventing Kidd from doing so. *Id.* Kidd told Plaintiff several times to remove his arm, and he continued to refuse. *Id.* Due to not knowing the circumstances of the Signal Green, Kidd grabbed Plaintiff's wrist and straightened his arm. *Id.* Plaintiff continued to resist by pushing his arm toward Kidd rather than withdrawing it. *Id.* Kidd warned him that if he did not remove his arm, he would be tased. *Id.* Plaintiff continued to refuse to comply. *Id.* Kidd then administered one 3.035-second drive stun to Plaintiff's forearm. *Id.*; Axon Taser Log Report, Doc. 9-1, at 5. Plaintiff pulled his arm out of the food pass, allowing Kidd and Becker to close the food pass door and respond to the Signal

Green.  *Id*. at 2.  After the Signal Green was resolved, Kidd, Deputy Dube, and Deputy Moreno returned to move Plaintiff.  Plaintiff put his hands outside the food pass to be restrained without incident.  *Id*.

The Report asserts that "[t]he use of force to attempt to move the Plaintiff's arm out of the food pass was a less painful alternative to using a taser, and when it failed the taser was used as a [last] resort."  (Doc. 9, at 2.)

The Report denies that any racist language was used during the incident, stating there are no other witnesses who corroborate Plaintiff's claim and the statement was not made "at any time on the officer body cam footage of the incident."  (Doc. 9, at 4.)

The Report states that Plaintiff did not ask to see a doctor until May 5, 2025.  (Doc. 9, at 4.)  A physician's note from that date states Plaintiff complained of left arm pain and said his arm was struck multiple times with the small door.  (Doc. 9-1, at 3.)  He also reported being tased in the arm multiple times.  *Id*.  The physician documented that Plaintiff had full range of motion without discomfort, no bony tenderness, and normal pronation and supination with neurovascular intact.  *Id*.  The doctor noted superficial anterior abrasions and diagnosed a forearm contusion.  *Id*.  Plaintiff was to return to the clinic as needed.  *Id*.  According to the medical records provided with the Report, Plaintiff's next medical visit was two months later for an unrelated complaint.  *Id*. at 4.

The Report did not initially include any video footage or photographs.  However, Plaintiff refers to photographs being taken of his arm after the incident, and the Report mentions bodycam footage of the incident.  (Doc. 9, at 4.)  The Court ordered the RCJ officials to file any photos or video of the incident and to allow Plaintiff to view them.

The video footage filed by the RCJ confirms Plaintiff's allegation about how long he was cuffed behind his back.  He remained cuffed even while he was temporarily placed in a different cell.  It is not possible to tell from the footage whether the cuffs were too tight, but Plaintiff appears to complain about the cuffs to at least two officers.  The footage confirms that Plaintiff briefly held his mattress in front of the door.  The footage provided does not appear to include any bodycam footage even though bodycams are referred to in the Report, and there is no audio.  The position of the camera makes it difficult to see exactly what Kidd did to Plaintiff's arm, although Plaintiff asserts that the footage shows Kidd slamming his arm with the food pass door at 6:57:14. (Doc. 23, at 2.)  The footage shows that Plaintiff was not the only inmate left in the flooded area.  The other remaining inmate appears to be Black.

## III.  Plaintiff's Response to the MOSC and the Report

Plaintiff expresses strong disagreement with portions of the Report and with the MOSC. As an initial matter, Plaintiff asserted that he had not been given the opportunity to view the video footage that Reno County eventually provided to the Court.  He makes this claim in his filing dated October 19, 2025.  (Doc. 22, at 4.)  However, in a filing received by the Court on November 10, 2025, Plaintiff indicates that he viewed the video on October 28, 2025.  (Doc. 23.)

Plaintiff alleges that the RCJ's use of force policy, Policy 303, provides that force should not be used as punishment or for disruptive behavior but only when inmates are fighting or physically resisting staff members.  Plaintiff attached a copy of Policy 303 to a motion for appointment of counsel filed on July 14, 2025.  (Doc. 7-1.)  The policy is titled, "Conducted Electrical Weapon" and appears to be from the Reno County Sheriff's Office Policy Manual.  The policy states that a taser device "is used to control a violent or potentially violent individual." *Id.* at 1.  It may be used when a subject is "violent or is physically resisting" or has demonstrated an

intention to be violent or to physically resist and "reasonably appears to present the potential to harm deputies, him/herself or others." *Id*. at 2. The policy further provides that the taser "shall not be used to psychologically torment, to elicit statements or to punish any individual." *Id*.

Plaintiff argues that the whole situation was avoidable because he had cleaned up the water in his cell and did not need to leave so the water could be removed. Plaintiff further notes discrepancies in Kidd's statement. Kidd said he stayed with Plaintiff during the Signal Green but later says he returned to Plaintiff's cell. Kidd said that while attempting to handcuff Plaintiff, Plaintiff refused multiple demands to remove his arm from the food pass, yet if Plaintiff's arms were in the food pass, he was not refusing to cuff up. Plaintiff states that Kidd screamed, "Fucking nigger!" as he tased Plaintiff. He points out that the photographs of his hands and arms taken after the use of force show deep grooves in his wrists from the handcuffs being too tight and left on him for two hours, as well as swelling and a burn on his forearm. Plaintiff continues to allege that he requested medical attention immediately after the use of force, asking Sergeant Stone, because his arm was swollen and he believed it was broken and because he had loss of feeling in his hands. He states that finally seeing Medical five days after the use of force is "inexcusable." (Doc. 19, at 1.)

Plaintiff's overall argument is that Kidd's actions were not reasonable and that he reacted with anger as if he had a "personal vendetta" against Plaintiff. (Doc. 18, at 1.) He asserts that Kidd's "anger made him forget the code of conduct." (Doc. 19, at 2.) Plaintiff states, "Jason Kidd used this taser as a punishment which is the wrong way to respond based of Policy 303. That's like saying just because someone don't have their shirt on in the day room [they're] able to Taser you if you don't put it on after they tell you. No, that's not right." *Id*. He further argues, "Had

[Kidd] opened my door with the food pass open and I tried to attack him that would have been a righteous reason but that wasn't the case." *Id*. at 3.

## IV. DISCUSSION

### A. Excessive Force

As explained in the M&O and the MOSC, "[e]xcessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth Amendment, depending on where in the criminal justice system the plaintiff is at the time of the challenged use of force." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (citation omitted). The Fourteenth Amendment governs any claim of excessive force brought by a "pretrial detainee"—one who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Est. of Booker v. Gomez*, 745 F.3d 405, 418–19 (10th Cir. 2014) (quoting *Bell v. Wolfish,* 441 U.S. 520, 536 (1979). On the other hand, the Fourth Amendment governs excessive force claims arising from "treatment of [an] arrestee detained *without a warrant*" and "*prior to* any probable cause hearing." *Id.*

Excessive force claims under both the Fourteenth and Fourth Amendments are based on objective reasonableness. The Supreme Court held in *Kingsley v. Hendrickson* that "the appropriate standard for a pretrial detainee's excessive[-]force claim is solely an objective one" and that therefore "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015); *see also Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) ("[T]here is no subjective element of an excessive-force claim brought by a pretrial detainee."). Therefore, to make out a Fourteenth Amendment violation,

Plaintiff must show that the defendants' conduct "was objectively harmful enough to establish a constitutional violation." *Brown*, 974 F.3d at 1183.

In assessing reasonableness, a court "looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Vette*, 989 F.3d at 1169 (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)). "The inquiry is an objective one, and one that considers the totality of the circumstances." *Id.* Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Supreme Court in *Graham* listed factors that may be relevant to the reasonableness analysis: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). In evaluating the final factor, a court considers "whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use of force." *Vette*, 989 F.3d at 1169. The Tenth Circuit has also held that "initial resistance does not justify the continuation of force once the resistance ceases." *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (citations omitted).

According to both Plaintiff's allegations and the Report, Plaintiff initially questioned Kidd's order to cuff up rather than obeying. In the MOSC, the Court found that Kidd had a legitimate reason for making the order in that the unit was flooded and Plaintiff needed to be moved. However, Plaintiff alleges that he had already cleaned up most of the water in his cell. In

addition, he questions the need to be cuffed to be moved to another cell only steps away on the same unit. Plaintiff admits that he put his arm through the food pass. He apparently did this at the same time as Kidd was trying to close the food pass door to go respond to a medical emergency. Plaintiff does not explain why he did this. On the other hand, the Report does not explain why it was reasonable for Kidd to repeatedly slam Plaintiff's arm with the food pass door as alleged by Plaintiff or to tase Plaintiff's arm, whether once or more than once, simply to close his food pass door. Then, once Plaintiff was restrained, he was left with his hands cuffed behind his back for two hours with cuffs that were allegedly too tight.

This Court recently considered another case where an inmate claimed excessive force related to a food pass door. In that case, the plaintiff alleged that he stuck his arm through the food pass to be uncuffed as ordered, and two corrections officers twisted his wrist severely and pulled the cuff so hard his forearm muscle tore. *Cheatham v. Howes*, No. 25-3091-JWL, 2025 WL 1784928, at *3 (D. Kan. June 27, 2025). In that case, the Court found the plaintiff's excessive force claim survived initial screening. *Id*.

Plaintiff disputes the allegations in the *Martinez* Report, maintaining his version of the events and his allegations set forth in his Complaint. The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The *Martinez* report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n.3 (10th Cir. 1983)). The Court "cannot resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits." *Id*. at 1109. "Furthermore, '[a] bona fide factual dispute

exists even when the plaintiff's factual allegations that are in conflict with the *Martinez* Report are less specific or well-documented than those contained in the report.'" *Bellamy v. Kansas*, 2024 WL 3718065, at n.5 (10th Cir. Aug. 8, 2024) (unpublished) (quoting *Hall*, 935 F.2d at 1109).

The Court is unable to resolve the factual disputes at this stage of the proceedings. Therefore, the Court finds that Plaintiff's excessive force claim survives the screening required by 28 U.S.C. § 1915A(a).

**B. Defendants**

In addition to Kidd, Plaintiff names Sergeant McDaniels, Captain Blumanhoerst, and Shawn (lnu), Undersheriff of Reno County, as defendants. It appears that these defendants are named on the basis of their response to Plaintiff's grievance about the incident.

Plaintiff's only allegations involving these defendants appear to relate to their denials of his grievance. The Tenth Circuit has held that "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Whitington v. Ortiz,* 307 F. App'x 179, 193 (10th Cir. 2009) (unpublished); *Larson v. Meek,* 240 F. App'x 777, 780 (10th Cir. 2007) (unpublished); *see also Lomholt v. Holder,* 287 F.3d 683, 684 (8th Cir.2 002) (per curiam) ("[Plaintiff] failed to state First Amendment claims relating to his grievances . . . because defendants' denial of his grievances did not state a substantive constitutional claim.")). Plaintiff has not adequately alleged any factual basis to support an "affirmative link" between these defendants and any alleged constitutional violation. *See id.*

The Tenth Circuit has held several times that there is no constitutional right to an administrative grievance system. *Gray v. GEO Group, Inc.*, No. 17–6135, 2018 WL 1181098, at *6 (10th Cir. March 6, 2018) (citations omitted); *Von Hallcy v. Clements*, 519 F. App'x 521, 523–

24 (10th Cir. 2013); *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011); *see also Watson v. Evans*, Case No. 13–cv–3035–EFM, 2014 WL 7246800, at *7 (D. Kan. Dec. 17, 2014) (failure to answer grievances does not violate constitutional rights or prove injury necessary to claim denial of access to courts); *Strope v. Pettis*, No. 03–3383–JAR, 2004 WL 2713084, at *7 (D. Kan. Nov. 23, 2004) (alleged failure to investigate grievances does not amount to a constitutional violation); *Baltoski v. Pretorius*, 291 F. Supp. 2d 807, 811 (N.D. Ind. 2003) (finding that "[t]he right to petition the government for redress of grievances . . . does not guarantee a favorable response, or indeed any response, from state officials"). Any claims regarding the grievance process and the failure to properly respond to grievances are dismissed for failure to state a claim, and Defendants McDaniels, Blumanhoerst, and Shawn (lnu) are dismissed from this action. The only remaining defendant is Jayson Kidd.

The Complaint and Plaintiff's responses to the MOSC and the Report include allegations about officers who are not named as defendants. For instance, Plaintiff alleges that Deputy Dube and Sergeant Stone refused to loosen or remove the handcuffs, and Stone refused to send Plaintiff to Medical. If Plaintiff wants to add defendants as the case proceeds, he will need to file an amended complaint.

### C.  Other Claims

Plaintiff alleges that Kidd used racial slurs and that Plaintiff was not moved out of the flooded cells while the white inmates were moved. These allegations are not sufficient to state an equal protection claim. "Mere verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.'" *Alvarez v. Gonzales*, 155 F. App'x 393, 396 (10th Cir. 2005) (unpublished), *quoting Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992)). Plaintiff has not credibly alleged that the defendants treated

him less favorable solely because of his race.  *See Morman v. Campbell County Memorial Hosp.*, 623 F. App'x 927, 934 (10ᵗʰ Cir. 2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  However, Plaintiff's allegations about Kidd's statements may be relevant to the question of whether Plaintiff was subjected to punishment.

Plaintiff also alleges that he was denied medical care after the incident.  "[D]eliberate indifference to a pretrial detainee's serious medical needs includes both an objective and a subjective component."  *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020) (finding that although a pretrial detainee's claim is based on the Fourteenth Amendment, the same standard for Eighth Amendment claims applies).  To establish the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Id.* at 989–90 (citations omitted).

A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 990 (citation omitted).  The "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."  *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm.  *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993).  In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay.  *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted).  "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata*

*v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

According to the Report, Plaintiff did not ask to be seen by Medical until five days after the use of force incident. At that point, he was examined by a doctor who found he had full range of motion without discomfort, no bony tenderness, and normal pronation and supination with neurovascular intact. The doctor noted only superficial anterior abrasions and diagnosed a forearm contusion. Plaintiff alleges that he asked Sergeant Stone for medical care immediately after the use of force incident, was denied care until five days later, and that he continues to suffer from loss of sensation. The Court is unable to resolve the factual disputes at this stage of the proceedings. Therefore, the Court finds that Plaintiff's denial of medical care claim survives the screening required by 28 U.S.C. § 1915A(a).

## V.  Pending Motions

Plaintiff has filed two motions (Docs. 22 and 23). Both appear to primarily be additional responses to the MOSC and the *Martinez* Report. To the extent Plaintiff seeks to supplement the Complaint to add claims, defendants, or relief, the motions are denied without prejudice to Plaintiff filing a proper motion to amend with a proposed amended complaint.

## VI.  CONCLUSION

The Court finds that Plaintiff's excessive force and denial of medical care claims survive the screening required by 28 U.S.C. § 1915A(a) and further finds that a responsive pleading is necessary. Because Plaintiff is proceeding in forma pauperis, the Clerk of the Court must undertake service of process under 28 U.S.C. § 1915(d).

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Order (Doc. 22) and Motion to Compel (Doc. 23) are **denied.**

**IT IS FURTHER ORDERED** that Defendants McDaniels, Blumanhoerst, and Shawn (lnu) are dismissed from this action.

**IT IS FURTHER ORDERED** that Plaintiff's excessive force and denial of medical care claims survive the Court's screening under 28 U.S.C. § 1915A.

**IT IS FURTHER ORDERED** that the Court directs the Clerk of the Court to prepare and issue a waiver of service form for Defendant Kidd pursuant to Fed. R. Civ. P. 4(d) to be served upon the defendant at no cost to Plaintiff.

**IT IS SO ORDERED**.

**Dated November 13, 2025, in Kansas City, Kansas.**

**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**